IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

OSAYAMIEN OGBEIWI,                    )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )     CIVIL NO. 1:20-cv-01094-STA-cgc
                                      )
CORECIVIC AMERICA,                    )
ET AL.,                               )
                                      )
          Defendants.                 )

---

ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Osayamien Ogbeiwi, an inmate previously housed at Whiteville Correctional Facility ("WCF"), filed this action pursuant to 42 U.S.C. § 1983, asserting claims under the Eighth and Fourteenth Amendments against CoreCivic America and various prison officials.[1] He also brought a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. The remaining defendants Assistant Warden Shane McLean, Jennie Roberts, Chief Sean Walton, and Nurse Practitioner Tasma Robertson have filed a motion for summary judgment (ECF No. 113), Plaintiff has filed a response to the motion (ECF Nos. 118, 119), and Defendants have filed a reply to the response.[2]   (ECF No. 112.) For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

---

[1]  The Court previously dismissed Plaintiff's Fourteenth Amendment Equal Protection and ADA claims against CoreCivic. (ECF No. 37.) It does not appear that Plaintiff brought these claims against any of the individual defendants, and Plaintiff acknowledges in his response that these claims are no longer viable. (Resp. p. 15, ECF No. 118.)   Therefore, the only claim to be decided in this motion is the Eighth Amendment claim.

[2]  With the Court's permission, Plaintiff has submitted a CD in support of his response. (ECF Nos. 125, 126.)

Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *Id.* at 251–52.   The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.

2

Statement of Undisputed Material Facts

Pursuant to Local Rule 56.1, the parties have submitted the following statements of facts (Defs' St. of Mat. Facts, ECF No. 113-2; Pl's St. of Mat. Facts, ECF No. 118-1), which are undisputed unless otherwise noted.[3] Before looking at the statement of facts, the Court must consider whether Plaintiff may rely on the allegations in his complaint to dispute certain facts put forth by Defendants.

In his response to Defendants' statement of undisputed facts, Plaintiff has cited his "verified complaint" as the authority for his denial of certain facts. However, as Defendants point out, the original complaint (ECF No. 1) does not contain Plaintiff's handwritten signature. Instead, his declaration, which is made under penalty of perjury pursuant to 28 U.S.C. § 1746, is typed other than the date which is filled in with Plaintiff's handwriting. The declaration reads:

> I, Osayamien Ogbeiwi, declare under the penalty of perjury under the law of the United States of American pursuant to 28 U.S.C. § 1746 that the abovementioned facts are true and correct to the best of my knowledge and understand[ing], and this is executed on this 17 (handwritten) day of APRIL (handwritten) 2020.

(Cmplt. p. 9, ECF No. 1.) Contrarily, the declaration to Plaintiff's motion to amend his complaint and the motion itself, which the Court granted on January 22, 2021 (ECF No. 12), is all in Plaintiff's handwriting. (Mot. p. 3, ECF No. 6.)   The issue presented is whether the complaint complies with the requirements of 28 U.S.C. § 1746 so that it can be considered to be verified.

Section 1746 provides in relevant part as follows.

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before

---

[3]   The facts are stated for the purpose of deciding this motion only.

a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)."

Given the explicit language of the statute, the Court would be more inclined to find Plaintiff's declaration to be deficient for the purpose of ruling on the motion for summary judgment, *see*, *e.g., Hogan v. Rent-A-Center, Inc.*, 228 F.Supp.2d 802, 806 n. 8 (S.D. Ohio 2002) ("[s]ince the document .... is neither an affidavit nor a declaration, the Court cannot consider it in ruling upon the motions for summary judgment."), if not for the handwritten signature on Plaintiff's declaration at the end of his motion to amend his complaint.[4] Although the better practice when submitting a declaration is to include a handwritten signature, in this case, the Court will allow the typewritten signature on the original declaration combined with the handwritten signature on Plaintiff's motion to amend to meet the requirements of § 1746.[5]

Moreover, the decision in *Middlebrooks v. Equifax, Inc.*, allowing the admission of a declaration with a typed signature, as opposed to a handwritten one, is persuasive.

The only potential issue is that Gobin's signature is typed, as opposed to handwritten. The Court has located no controlling authority on this question, but the strong weight of the persuasive caselaw provides that electronically-signed declarations are generally afforded the same status as hand-signed declarations. *See Flakes v. Carr*, No. 21-2464, 2022 WL 519909, at *1 (7th Cir. Feb. 22, 2022)

---

[4] In ruling on the present motion, the Court was made aware that Plaintiff never filed an amended complaint. However, the Court and the parties have treated the original complaint as the operative complaint throughout the litigation. The proposed amendment merely increased Plaintiff's demand for damages.

[5] The Court's decision is specific to the facts of this case.

4

("Declarations must be signed under penalty of perjury, but nothing in 28 U.S.C. §
1746 requires handwritten signatures.").

2023 WL 2370480, at *6 (N.D. Ga. Jan. 20, 2023), rep. & rec. adopted, 2023 WL 2876429 (N.D.

Ga. Mar. 14, 2023) (footnotes and some citations omitted).[6]

Another point to consider is that the declaration states that "the abovementioned facts are
true and correct to the best of my knowledge and understand[ing]," while § 1746 requires the
declarant to state unequivocally that the facts are "true and correct." The Court will follow the lead
of the Court in *Montgomery v. Whidbee* and "exercise its discretion to consider as verified only
statements made in [the] complaint … [that] reflect [Plaintiff's] personal knowledge." 2023 WL
2254531, at *1 n.1 (M.D. Tenn. Feb. 27, 2023), rep. & rec. adopted *sub nom. Montgomery v.
Jamison*, 2023 WL 2484254 (M.D. Tenn. Mar. 13, 2023) ("When an affidavit is made on
'knowledge and belief,' 'the district court has discretion to determine whether it can differentiate
between knowledge and belief for each averment' and '[i]f the court can distinguish between the
two ... the court ... must admit the parts based solely on personal knowledge while striking the
parts based upon belief.'" (citations omitted)).

Finally, the Court notes that this is not a case in which the admittance of a declaration is
outcome determinative in ruling on the motion for summary judgment. Plaintiff has pointed to
excerpts of his deposition which reiterate the allegations in his complaint for most of Defendants'
facts that he attempts to refute. Accordingly, the Court will accept the following statement of facts
as being undisputed for the purpose of ruling on this motion.

At all times relevant, Tasma Robertson worked as a licensed nurse practitioner at WCF,

---

[6] Although the *Middlebrooks* Court used the phrase "electronically-signed declaration," it does
not appear that the signature at issue in that case was preceded by an s/.

Shane McClain worked as the assistant warden of operations, Sean Walton worked as the chief of security, and Jennie Roberts worked as a security threat group ("STG") (gang affiliation) coordinator.

On March 25, 2019, Plaintiff engaged in two separate physical altercations involving other inmates, one of which involved the use of handmade knives.  As punishment for his participation in the physical altercations with other inmates, officials placed Plaintiff in administrative segregation housing. Administrative segregation results in an inmate's being segregated and housed away from general population during the pendency of the investigation concerning the inmate's involvement in, for example, a physical altercation.

Plaintiff was charged with a disciplinary infraction as a result of his participation in the physical altercations. Plaintiff pled guilty on March 25, 2019.

At WCF, prison staff investigate all inmate fights, in part, to determine whether they were related to gang activity and to determine whether the participants can be safely returned to general population. While Plaintiff was housed in administrative segregation, McClain, along with other nonparty WCF officials, investigated the March 25 incidents. The investigation revealed that the incidents involved inmates with gang affiliation.  As a result, WCF further investigated the incidents, which included interviewing the inmate participants as well as other inmates with the specific purpose of ensuring that Plaintiff and other participants could be safely returned to general population.

While still in administrative segregation housing, Plaintiff proposed as an option, if he had to be returned to general population, that he be returned with specific other inmates. ("I asked . . . -- if I had to be placed back in general population, don't put me out there by myself.").

Once an inmate informs WCF staff that he can be safely returned to general population, an

inmate cannot place stipulations upon how he is returned to general population, such as dictating that he be returned to general population with certain other inmates. However, TDOC Policy 404.09(VI)(A)(1) requires a protective custody investigation upon any notification of danger.

Plaintiff remained in administrative segregation housing until April 26, 2019. On April 26, Walton released Plaintiff from administrative segregation housing, and Plaintiff returned to general population.   At the time of his release from administrative segregation, Plaintiff did not refuse his new cell assignment. Plaintiff understood that refusing his cell assignment would result in his remaining in segregation with a possible disciplinary charge.

After returning to general population on April 26, Plaintiff was assaulted by other inmates and sustained physical injuries.   After the assault, a correctional officer discovered Plaintiff in his cell.   An officer initiated a medical code, and staff responded. WCF staff placed Plaintiff on a stretcher and transported him to the WCF medical department.   At the medical department, medical providers treated and sutured Plaintiff's wounds before EMS arrived and transported him to a local hospital.

EMS initially took Plaintiff to Jackson Madison-County General Hospital ("JMCSS"), but JMCSS then sent Plaintiff to Regional One in Memphis where he remained hospitalized for approximately one week. After being discharged from Regional One, Plaintiff returned to the WCF infirmary.   During his time in the WCF infirmary, Plaintiff received all the medical treatment that he needed.

After he was released from the infirmary, WCF placed Plaintiff on protective custody until being transferred to another prison facility in September 2019.   At all times relevant, WCF's policy concerning protective services for inmates who are deemed at risk of physical harm from other inmates tracked the policy of TDOC.

Pursuant to TDOC policy, a mere expression from an inmate that he "fears for his life," without something more, would not warrant protective custody placement although an investigation would first be required to determine if "more" actually existed. When the facts obtained through a protective services inquiry indicate that protective custody placement is warranted and there are no reasonable alternatives available, protective custody will be provided.

STG coordinator Roberts did not participate in the investigation concerning the March 25, 2019 incidents involving Plaintiff because she was off work at the time.[7]   No one ever indicated to Roberts that Plaintiff refused his cell assignment at the time of his release from administrative segregation on April 26, 2019.

Walton did not participate in the WCF investigation concerning the March 25 incidents that led to Plaintiff's initial placement in administrative segregation.[8]   Walton was never made aware that members of Plaintiff's family allegedly contacted WCF concerned for his safety.

At no point before Plaintiff's release from administrative housing on April 26 was McClain made aware that members of Plaintiff's family allegedly contacted WCF concerned for his safety. No one ever indicated to McClain that Plaintiff allegedly refused his cell assignment at the time of his release from administrative segregation on April 26.

As a licensed nurse practitioner at WCF, Robertson reviewed outside medical provider records concerning inmates including Plaintiff.

On May 13, 2019, Plaintiff went to an offsite appointment at Regional One Hospital. At Regional One, medical providers diagnosed Plaintiff with a lacerated tendon and scheduled a

---

[7]   Plaintiff contends that, even if she did not participate in the investigation, she was briefed about it.
[8]   Plaintiff contends that, even if he did not participate in the investigation, he was briefed about it.

surgery to repair the injury for May 17, 2019.   When Plaintiff returned to the prison from his appointment at Regional One on May 13, Robertson issued an order to staff to reschedule Plaintiff's offsite surgery because Plaintiff returned to WCF aware of the date and time of his offsite surgery. At WCF, inmates are not permitted to know the dates, times, or specifics concerning their scheduled offsite medical appointments in the interests of the safety and security both of the inmates and the officers.   Once security is made aware of such a breach of security, they are required to reschedule the appointment.   Once she was made aware that Plaintiff returned to WCF aware of the particulars concerning his offsite appointment, Robertson informed security staff, and Plaintiff's appointment was rescheduled per WCF policy.

Plaintiff's hand surgery was rescheduled from May 17 to May 31, 2019.   Hospital records from July 22, 2019, state that Plaintiff "Never showed" for the surgery appointment on May 31, 2019.   Plaintiff's surgery was rescheduled from May 31 to July 22, 2019 for reasons not stated in the record.

On July 18, 2019, Robertson gave approval to transport Plaintiff for his scheduled appointment at Regional One on July 22, 2019.   WCF transported Plaintiff to Regional One for a follow-up appointment on July 22.   At that time, a physician at Regional One informed Plaintiff that the physician intended to proceed with a nonoperative treatment plan and instructed Plaintiff to perform at-home physical therapy for his hand.

As a nurse practitioner at WCF, Robertson was not responsible for scheduling offsite appointments for inmates including Plaintiff. Plaintiff "disputes" this fact and points to Robertson's declaration at paragraphs 4 and 7. (ECF No. 113-12.)   However, the declaration is clear that Robertson did not personally schedule the medical appointments of inmates.   Robertson expected the appropriate staff to schedule Plaintiff's offsite appointments in accordance with her

orders and directives. Robertson personally never failed to schedule any offsite appointment for surgery for Plaintiff.

WCF follows TDOC Policy that allows inmates to submit a written grievance concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate by staff or other inmates, or any condition or incident within WCF, which personally affects the inmates.   The grievance process requires an inmate to submit a grievance within "seven calendar days of the occurrence giving rise to the grievance."

The grievance process provides three levels of review. Such grievances are first reviewed by a Grievance Chairperson and submitted to the appropriate supervisor, who issues a response which the Grievance Chairperson returns to the inmate. Within five days of being notified of the Grievance Chairperson's response, the inmate may appeal to the grievance committee and Warden. If an inmate appeals, the grievance committee holds a hearing on the inmate's grievance and issues a recommendation to the Warden. After reviewing the grievance and the committee's recommendation, the Warden makes a decision. The inmate may then appeal the Warden's decision within five days to the Deputy Commissioner of the TDOC. The decision of the Deputy Commissioner is final and not appealable.

Pursuant to TDOC policies and procedures, an inmate has exhausted his administrative remedies when the inmate has filed an appropriate and proper grievance and appealed the response all the way through the TDOC Commissioner's Office.[9]

---

[9] Plaintiff objects to Defendants' reliance on the submission of various TDOC policies by Ashley Wilkes, the current grievance chairperson at WCF (ECF No. 113-8), on the ground that she was not timely identified as a fact witness. Defendants respond that Plaintiff did not propound any written discovery, and, in their initial disclosures, they identified as potential witnesses "[a]ny other individuals who were or are employed by CoreCivic or the Tennessee Department of Correction who may have knowledge of facts relating to Plaintiff's claims and/or

The prison's policy on protective custody is listed in TDOC Policy 404.09. (ECF No. 118-6.) The prison's policy on grievances is listed in TDOC Policy 501.01. (ECF No. 118-7.)

Plaintiff submitted two grievances during his incarceration at WCF. Plaintiff submitted a grievance on May 31, 2019, grievance number 335240/22778.  He submitted a separate grievance, number 336726/22821, on July 30, 2019.

In the May 31, 2019 grievance, Plaintiff did not use the term "protective custody," but, rather, he stated that he advised the guards that if he were put back in general population alone, it would place him in a "very vonerable possision and in harms way[.]" He also stated that his family had reported concerns about his safety. He further stated that McClain had discussed sending him to another prison and that McClain and Roberts were "counseling" with another inmate about whether Ogbeiwi was in danger, suggesting that they had insider knowledge about the danger and were deliberately indifferent to his safety.   He did not raise any concerns related to refusing his cell assignment, and, in fact, he did not refuse any cell assignment. (Griev. ECF No. 118-4.)

In the May 31, 2019 grievance, Plaintiff did not name Walton but did state that "[T]hey released my celly and I by ourselves[.]" (*Id.*) Walton was the guard who released Plaintiff and his cellmate into general population.

In his July 30, 2019 grievance, Plaintiff referenced several medical issues including his assertion that a surgical procedure for his hand was not timely scheduled.

Plaintiff was convicted of first-degree murder and has been incarcerated since 2006.

---

Defendants defenses" as well as the two grievances filed by Plaintiff. (ECF No. 120-1.) The Court will allow the testimony of Wilkes as it relates to authenticating the relevant TDOC policies and Plaintiff's two grievances attached to the declaration. However, to the extent that Wilkes has "summarized" TDOC policies/instructions without attribution to a specific policy or instruction, those statements create a disputed issue of fact and will be subject to cross-examination at trial.

Analysis

Plaintiff has two surviving claims under the Eighth Amendment: failure to protect and deliberate indifference to his serious medical needs. The failure to protect claim is brought against Defendants McClain, Walton, and Roberts, while the medical needs claim is brought against Defendant Robertson.[10]

Defendants first contend that they are entitled to summary judgment because Plaintiff did not exhaust his administrative remedies on his failure to protect claim because he did not specifically ask for protective custody. They also contend that he did not exhaust his claim against Defendant Walton because he did not specifically name Walton in the grievance. It is undisputed that Plaintiff filed a timely grievance on his failure to protect claim and went through the proper steps. Therefore, the Court must determine if the grievance itself was specific enough to put Defendants on notice as to exactly what Plaintiff was grieving.

The Sixth Circuit recently provided guidance on this issue.

> Congress enacted the PLRA to "reduce the quantity and improve the quality of prisoner suits." *Lamb v. Kendrick*, 52 F.4th 286, 292 (6th Cir. 2022) (citations omitted). To that end, Congress decreed that "[n]o action shall be brought with respect to prison conditions under [federal law] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The exhaustion requirement is intended "to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford v. Ngo*, 548 U.S. 81, 94–95, 126 S. Ct. 2378, 165 L.Ed.2d 368 (2006)). The Supreme Court has held that prisoners must complete "proper exhaustion," *i.e.*, must use "all steps that the [prison] holds out." *Woodford*, 548 U.S. at 90, 126 S. Ct. 2378. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to

---

[10] At various times in his complaint, Plaintiff used the names "Roberts" and "Robertson" interchangeably. The parties have clarified that Roberts was the STG officer against whom the failure to protect claim is brought and Robertson is the LPN against whom the indifference to medical needs claim is brought.

'properly exhaust.'" *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L.Ed.2d 798 (2007).

> Until 2007, the Sixth Circuit imposed "several procedural rules designed to implement this exhaustion requirement and facilitate early judicial screening" of prisoner claims. *Id.* at 202–03, 127 S. Ct. 910; *see, e.g.*, *Burton v. Jones*, 321 F.3d 569, 574–75 (6th Cir. 2003). The Supreme Court held that these rules exceed the scope of the PLRA, and that "crafting and imposing them exceeds the proper limits on the judicial role." *Jones v. Bock*, 549 U.S. at 203, 127 S. Ct. 910. For example, the Supreme Court held that the Sixth Circuit rule requiring prisoners to identify each defendant to be sued in their first grievance "lack[ed] a textual basis in the PLRA." *Id.* at 217, 127 S. Ct. 910. The emphasis, then, is on the grievance procedures themselves under "usual procedural practice" and "normal pleading rules." *Id.* at 214, 218, 127 S. Ct. 910; *Lamb*, 52 F.4th at 292.

*Morgan v. Trierweiler*, 67 F.4th 362, 366–67 (6th Cir. 2023).   The Court further instructed that:

> [b]ecause defendants carry the burden of proof for exhaustion, they bear an "initial summary judgment burden [that] is higher in that [they] must show that the record contains evidence satisfying [their] burden of persuasion" and "that no reasonable jury would be free to disbelieve it." *Doe v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019) (quoting *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)). Summary judgment is appropriate in this context only if "there is no genuine dispute of material fact that the plaintiff failed to exhaust." *Id.* at 961 (citing *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

*Morgan*, 67 F.4th at 366.

Here, the Court finds that Defendants have not carried their burden to show that "there is no genuine dispute of material fact that the plaintiff failed to exhaust." First, what the prison actually required for proper exhaustion is in dispute. The testimony of Ashley Wilkes as to the prison's requirements appear to go beyond the requirements of TDOC Policy 501.01. As noted above, Wilkes testified about the prison's requirements in a conclusory manner without attributing those requirements to any source. At trial, Defendants will be able to present evidence as to the requirements for exhaustion.

Moreover, the sample "inmate grievance" form (ECF No. 118-7) attached to Policy 501.01 merely asks the inmate for a "description of the problem" and "requested solution." There is no

mention of a requirement for a specific name, although, of course, there must be some reference to the officer whose actions are being grieved. In this case, the jury could find that Defendant Walton was sufficiently identified in the grievance when Plaintiff stated that "they released my celly and I by ourselves," and Walton was the guard who released Plaintiff and his cellmate into general population.

As for the omission of the term "protective custody" in the grievance, the jury could find that Plaintiff was generally grieving the officers' alleged failure to protect him which led to his attack by other inmates. Providing protective custody would have been one way to protect him, but not necessarily the only way. At one point there was a suggestion that Plaintiff might be transferred to another prison for his protection. Plaintiff also suggested being released into general population with certain allies. While this suggestion apparently went against prison policy, it gives weight to Plaintiff's claim that he was seeking to be protected from other inmates regardless of the form that protection took. Accordingly, Defendants' motion for summary judgment on this ground is denied.

Next, Defendants contend that they are entitled to summary judgment because Plaintiff cannot show that they were deliberately indifferent to his safety. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). Thus, conduct by prison officials that involves the "unnecessary and wanton infliction of pain" is prohibited. *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with

"'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).   The Eighth Amendment protects inmates by requiring that "prison officials … ensure that inmates receive adequate food, clothing, shelter, and medical care, and … 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 833 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

In *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), the Supreme Court set out a framework for courts to use when deciding whether certain conditions of confinement constitute cruel and unusual punishment prohibited by the Eighth Amendment. A plaintiff must first plead facts which, if true, establish that a sufficiently serious deprivation has occurred. *Id.* Seriousness is measured in response to "contemporary standards of decency." *Hudson*, 503 U.S. at 8. Only deliberate indifference to serious medical needs or extreme deprivations regarding the conditions of confinement will implicate the protections of the Eighth Amendment. *Id.* at 9. In the present case, Defendants do not dispute that Plaintiff suffered serious injuries when he was attacked after being released into general population. Plaintiff received multiple stab wounds and was diagnosed with a punctured lung and a lacerated tendon in his left hand. Therefore, the objective prong has been met.

A plaintiff must also establish a subjective element showing the prison officials acted with a sufficiently culpable state of mind. *Id.* Deliberate indifference is characterized by obduracy or wantonness, not inadvertence or good faith error. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Liability cannot be predicated solely on negligence. *Id.* This standard is met if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." *Flanory v. Bonn*, 604 F.3d 249, 253-55 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 837).   A prison official violates the Eighth Amendment only when both the objective and subjective requirements are met. *Farmer*, 511 U.S. at 834.

To adequately allege that prison conditions constitute such a substantial risk to an inmate's safety that they implicate the Eighth Amendment, the inmate must "identify [a] specific threat." *Halliburton v. Sunquist*, 59 F. App'x 781, 782–83 (6th Cir. 2003). There is no dispute that, in this case, Defendants had reason to believe, after the first attack on Plaintiff by rival gang members, he might be at risk if he was released into general population, and they have presented evidence in the form of their own testimony that they investigated any potential risk and determined that Plaintiff would be safe in general population. Defendants McClain, Walton, and Roberts have all submitted their own deposition testimony and declarations in which they state that, after the investigation, they were not aware of a specific treat against Plaintiff prior to his being returned to general population. (McClain Depo., ECF No. 113-4; McClain Decl., No. 113-9; Walton Depo., No. 113-7; Walton Decl., No. 113-8; Roberts Depo., No. 113-5; Roberts Decl., No. 113-11.) They each also state that Plaintiff would have been kept in administrative segregation if they had known of a specific threat against Plaintiff.   (*Id.*)

In response, Plaintiff points to statements in his verified complaint and to excerpts from his own deposition to refute Defendants' "undisputed facts." Specifically, he alleges in his verified complaint (Cmplt. p. 3, ECF No. 1) that Defendant McClain told him that threats had been made by gang members that Plaintiff would be harmed if he was returned to general population. Plaintiff asserts that McClain told him that he would be transferred to another prison because "multiple" gang members had warned McClain that Plaintiff would be "severely harmed" if he returned to general population. (*Id.*)

16

The complaint also states that Plaintiff requested that Defendant Roberts send him to another prison but "Roberts insisted that he be returned to general population despite the violent threats made against him." (*Id.* at p. 4.)   Also, when Defendant Walton told Plaintiff that he was being returned to general population, he told Walton that he would be harmed by other inmates who had threatened his life, but Walton ignored his plea. (*Id.*)   Walton then told him that, if he refused to be moved, he would be given a written disciplinary report.   (*Id.*)   Plaintiff reiterated his contentions in his deposition. (McClain said that "They said they were going to do something to y'all if ya'll come back out." (Pl's Depo. p. 7, ECF No. 113-3); Plaintiff requested to McClain and Roberts that he be placed in protective custody. (*Id.* at pp. 8-9); Plaintiff told Roberts that he would not be safe in general population. (*Id.* at p. 10); Walton told Plaintiff that he would be written up if he refused to be moved to general population. (*Id.* at p. 11)).

Defendants point to Plaintiff's suggestion that he was willing to be released into general population if other inmates who were his allies could be released with him. They use this as "evidence" of the lack of a viable threat to Plaintiff's safety. However, Plaintiff has presented his own testimony that he would be subject to a disciplinary action if he refused a new cell assignment and that he explained to defendant officers that he would feel safer if he was not released alone. (Pl's Depo. p. 7, ECF No. 113-3.) The jury will be tasked with making a credibility determination as to which interpretation to believe.

Defendants argue that prisons are "necessarily dangerous places" and that "some level of violence might be unavoidable."   (Memo. p. 10, ECF No. 113-1.) They correctly point out that "the risk of harm must go above and beyond that encountered when any group of inmates are left unsupervised for any amount of time."   (*Id.*). However, the jury could find Plaintiff's testimony that Defendants were aware of the threat to him to be credible especially in light of the March

incident in which Plaintiff was injured by rival gang members.

The jury could find that there was a specific threat against Plaintiff if he was released back into general population and that Defendants McClain, Walton, and Roberts knew of that threat and yet deliberately disregarded the threat which equated to a substantial risk of serious harm to Plaintiff and that their actions were not taken out of "inadvertence or good faith error." That is, they were deliberately indifferent to Plaintiff's safety, thus defeating Defendant's motion for summary judgment on this claim.

Plaintiff's second claim is that Defendant Robertson was deliberately indifferent to his serious medical needs by not ensuring that he was taken off-site for hand surgery in a timely manner. There is no dispute that Plaintiff received appropriate medical care prior to the cancellation of his hand surgery. Instead, his claim is based on his not receiving surgery on his hand.

According to the undisputed facts, after the April 26 attack, Plaintiff was taken to the emergency room at JMCGHospital and then transferred to Regional One where he stayed for approximately one week. He returned to Regional One on May 13, 2019, for a follow-up appointment. At that time, the physician scheduled hand surgery for Plaintiff for May 17. However, upon Plaintiff's return to the prison, Defendant Robertson instructed the clinical staff to reschedule the surgery because prison policy prohibits an inmate's knowing the date and time of an outside medical appointment.

Plaintiff testified in his deposition that he told Robertson that the physician had stated that he needed to return for hand surgery "soon" because otherwise the damage would become permanent.  (Pl's Depo. p. 20, ECF No. 113-3.) Robertson told Plaintiff that he was not going back for surgery on May 17 because he knew the date of his appointment, but she did not tell him

that he would not be able to have the surgery at all. (*Id.*)   Plaintiff ultimately returned to Regional One on July 22. At that time, the physician stated that he intended to proceed with a nonoperative treatment plan.   (*Id.* at p. 21.)   The physician told him that it was too late for surgery and the damage was permanent and that physical therapy was the only option. (*Id.* at p. 22.)

In her own deposition, Robertson testified that TDOC policy prohibits an inmate from knowing the date he is scheduled to leave the facility for a medical appointment. (Robertson Depo. p. 4, ECF No. 113-6.) Thus, the May 17 surgery date was rescheduled to May 31, later canceled by Regional One, and then rescheduled for July 22, according to Robertson.   (*Id.*)   The medical records clerks do the scheduling rather than Robertson. (*Id.* at p. 5.)   Robertson fills out the approval form for an outside appointment to be made, but the medical records clerks coordinate with the provider's office to schedule the appointment. (*Id.*)   Robertson testified that the infirmary's records show that on May 29 "Regional One contacted the facility, spoke with the medical record clerks, notified them that the surgery needed to be canceled on their behalf and rescheduled."[11]  (*Id.* at p. 6.)   Robertson was notified of the cancellation but does not know why Regional One needed to reschedule the May 31st appointment. (*Id.* at pp. 6-7.)   Ultimately, the appointment was scheduled for July 22. (*Id.* at p. 7.)   Regional One set that date, and Robertson had nothing to do with it, according to her testimony. (*Id.*)

Having to reschedule the surgery for so long concerned Robertson, but the cancellation and the rescheduling were the responsibility of Regional One. (*Id.* at p. 8.)   Robertson's declaration reiterates "Regional One, however, contacted the medical records clerk assigned to WCF and

---

[11]  This is apparently in reference to the May 31 appointment that had been rescheduled from the May 17 appointment.   (Rec. p. 14, ECF No. 113-6.)

rescheduled his surgery appointment from May 31, 2019 to July 22, 2019 for unknown reasons.[12]

I am not aware of why Regional One rescheduled Plaintiff's appointment from May 31, 2019 to

July 22, 2019, nor did I have any part in Regional One rescheduling Plaintiff's surgery."

(Robertson Decl. para. 5, ECF No. 113-12.)   Additionally,

> As a nurse practitioner at WCF, I was not responsible for the scheduling of
> Plaintiff's offsite appointments, including, but not limited to, appointments for
> surgical intervention, nor have I ever been responsible for the scheduling of medical
> procedures at Regional One. Rather, the medical records clerk(s) assigned to WCF
> were responsible for scheduling inmate offsite appointments. At all times relevant,
> I expected the appropriate staff to schedule Plaintiff's off-site appointments in
> accordance with my orders and directives. Accordingly, I never failed to schedule
> any offsite appointment for surgery for Plaintiff.

(*Id.* at para. 7.)

The physician's progress notes for July 22, 2019, state that the reason for the visit was

"reschedule surgery left hand tendon repair" and "Never showed for surgery." (Rec. p. 39, ECF

No. 113-12.)

"Deliberate indifference" to the serious medical needs of prisoners constitutes the

"unnecessary and wanton infliction of pain" and is, therefore, "proscribed by the Eighth

Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). To establish this type

of claim, a prisoner must show (1) a serious medical need, and (2) deliberate indifference to that

medical need on the part of a defendant. *Farmer*, 511 U.S. at 837. Therefore, a medical deliberate

indifference claim has both an objective and subjective component akin to that of a failure to

protect claim.   *See Mattox v. Edelman*, 851 F.3d 583, 597 (6th Cir. 2017) (summarizing the

standard for a medical indifference claim).

---

[12] Infirmary records contain a progress note for May 29, 2019, which states "Surgery cancelled
& rescheduled per Reg One." This note was signed by Robertson. (Exh. p. 6, ECF No. 113-12.)

To satisfy the objective component of the analysis, a plaintiff must show the existence of a serious medical need: "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citation omitted). Clearly, Plaintiff has met this prong. He was in the hospital for at least a week, and his physician ordered surgery on his hand.  Defendants have pointed to no evidence in the record to refute the seriousness of Plaintiff's injuries.

The subjective component of the analysis has to do with the mental state of the defendants: the plaintiff must show that a defendant acted with a mental state "equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40.) This showing requires proof that a defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Negligence is not sufficient to establish deliberate indifference. "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703; *see also Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Farmer*, 511 U.S. at 835 (explaining that deliberate indifference "describes a state of mind more blameworthy than negligence"). Thus, "a prison medical care provider can be said to have inflicted cruel and unusual punishment only through the 'unnecessary

and wanton infliction of pain.' It is not enough just to show 'inadvertent failure to provide adequate medical care,' or a 'negligent ... diagnos[is].'"    *Coverdale v. Conley*, 2023 WL 246831, at *3 (6th Cir. Jan. 18, 2023) (citations omitted).

In the present case, Defendants have provided unrefuted testimony that Robertson did not reschedule the May 31 surgical appointment and that, instead, it was rescheduled by Regional One. Although the notation by Regional One that Plaintiff "never showed" for the May 31 appointment gives the Court pause, there is nothing in the record that connects the rescheduling to Defendant Robertson. Neither is there anything in the record showing any animus of Defendant toward Plaintiff or any intention for him not to receive the requisite medical care.

Even though Robertson appears to have been responsible for supervising the medical records staff, the actions of the staff cannot be attributed to her under the doctrine of respondeat superior – assuming that the staff had a duty to follow-up with Regional One, and the Court does not make that assumption. Moreover, Plaintiff has not argued that any misconduct or failure to provide medical care is the result of Defendant Robertson's failure to supervise her staff.

The liability of supervisors cannot be based solely on the right to control employees or "simple awareness of employees' misconduct." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003). That is, a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. *See*, *e.g.*, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).   There must be a direct causal link between the acts of individual officers and the supervisory defendant. *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). Here, there is no such link.

Defendants have pointed to evidence in the record that Defendant Robertson was not

deliberately indifferent to the serious medical needs of Plaintiff in that she played no part in the rescheduling of Plaintiff's hand surgery, and Plaintiff has not refuted that evidence.   Therefore, the Court grants summary judgment to Defendants on this claim.

In summary, the Court **DENIES** Defendants' motion for summary judgment on the Eighth Amendment failure to protect claim and **GRANTS** the motion on the Eighth Amendment deliberate indifference to serious medical needs claim.   Tasma Robertson will be terminated as a defendant in this matter.

IT IS SO ORDERED.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:   July 27, 2023.